18 69
4ap522

THE TRUSTEES OF THE FIRST BAPTIST CHURCH IN BROOK-LYN and others *vs.* THE BROOKLYN FIRE INSURANCE COMPANY.

An insurance company may *waive* its general rule requiring premiums to be paid before policies shall take effect, and give *credit* for a premium until called for.

Where such a company agrees that a policy for one year shall be renewed from year to year, and be *a permanent risk*, and that its officers will from time to time call upon the assured with the annual receipts or certificates, and collect the premiums as they become due, and the assured, relying upon such promise, omits to call and pay the premium and get a renewal, and the insurers fail to call for the premium when it becomes due, and the property insured is destroyed by fire, the insurance company is liable for the loss.

A corporation acts and speaks by its officers; and what *they* say, when in discharge of their duty as officers, and in relation to that duty, is evidence against the corporation.

The president and secretary of an insurance company are the officers to whom the preliminary proofs of loss are to be presented, and if, on being notified of a loss, they admit that they had agreed to insure the property, or to keep it insured, it is a statement made in the course of their duties, and binds the company, as much as their certificate of premium paid, and of a renewal, would bind the · company.

An agreement to insure, or to execute a policy, may be by parol. The reasons why a *policy* must be in writing do not apply to such an agreement.

An agreement that a policy of insurance shall be renewed from year to year, by the giving of a certificate of renewal each year, is not void by the statute of frauds, as a contract not to be fulfilled within a year.

ON the 22d of July, 1845, the defendants insured the plaintiffs' church against fire for one year, to the amount of $5000. The policy was not delivered on that day, nor was any memorandum given, or premium paid; but a verbal agreement was made between the agents of both parties, that the church should be considered insured, and that the policy should be made out, and the premium paid in a convenient time afterwards. The policy contained a provision that the insurance might be continued for such further term as might be agreed on, the premium being paid and indorsed on the policy, or a receipt given for it. The policy was afterwards delivered, but the premium was not paid till the 21st of February, 1846, when the president of the insurance company collected it of the treasurer of the church, at his office. Some days before the policy expired, the president of the com-

pany called again on the treasurer of the church, and then an arrangement was made that the policy should be renewed from time to time, without further notice, until one party or the other should give notice of an intention to discontinue the renewal; until which time, it was understood that the church should pay the premium, and the company make the renewal and give a certificate thereof. In pursuance of this arrangement the parties went on, the company at its convenience sending a renewal certificate to the church, and the church at its convenience paying the premium; the two acts being in no case performed at the same time, and neither of them until after the time of the previous insurance had expired. The church was burned on the 10th of September, 1848; the company not having as yet sent the renewal certificate, or called for the premium. The last renewal certificate had been taken to the church after the 22d of July, 1847. It was proved that the company had been in the practice of making permanent arrangements for renewals similar to that in this case. The case before the jury turned upon the fact of there having been an arrangement made, as the plaintiffs alleged, and the jury found that there had; the court charging, "That if the jury believed that an arrangement was made, as testified to by Mr. Lewis, that certificates of renewal were given for two years, and that the last was given after the 21st of July, 1847, then the last renewal, connected with the agreement and the course of dealing, would operate as a contract to give a renewal on the 21st day of July, 1848, and would entitle the plaintiffs to recover."

The jury found a verdict for the plaintiffs for $5000 and interest; and from the judgment entered thereon the defendants appealed.

*J. Van Buren*, for the appellants. I. The complaint should have been dismissed by the judge on the trial, upon the grounds stated in the bill of exceptions. (1.) The policy of insurance, and the several renewals thereof, constituted the contracts between the parties. The risk terminated by the terms of the last renewal on the 21st July, 1848, at noon; there was no contract for renewal after that date. No prior verbal conversations

or arrangement are admissible to vary, increase, or affect the terms of the written contract. (*Mumford* v. *McPherson* 1 *John.* 418. *Howes* v. *Barker*, 3 *id.* 509. *Van Ostrand* v. *Reed*, 1 *Wend.* 424. *Hunt* v. *Amidon*, 4 *Hill*, 346. *Niles* v. *Culver*, 8 *Barb.* 207. 2 *Cowen & Hill's Notes*, 1466.) (2.) The verbal understanding or agreement to keep the premises insured, after the 21st July, 1848, set up by the plaintiff, (even if proved,) is not valid, because a contract of insurance must be in writing. (*Cockerill* v. *Cincinnati Mutual Ins. Co.*, 16 *Ohio R.* 148.) The charter of this company requires " that policies of insurance and other contracts founded thereon," should be in writing, signed by the president, and countersigned by the secretary. (*Laws of* 1824, *p.* 178, § 10. *Laws* 1845, *p.* 123. *Angel & Ames on Cor.* 3d ed. 278, 279. *Head* v. *Providence Ins. Co.* 2 *Cranch*, 167. *Beatty* v *Marine Ins. Co.*, 2 *John.* 109. *Dawes* v. *North River Ins. Co.*, 7 *Cowen*, 462.) The policy itself prescribes the mode of continuing the risk after the 21st July, 1848 ; each renewal certificate continued in force policy No. 1043, for a fixed term ; this continued in force every claim and condition of the policy ; subsequent renewals could only be made in conformity with the terms of the policy. (3.) No conversation occurred between Mr. Lewis and Mr. Ellsworth from on or about 21st July, 1847, until after the fire. The renewal certificate of that year, which continued in force the policy until the 21st July, 1848, and all its provisions and conditions, constituted the contract between the parties thereto. (4.) The conversation between Mr. Lewis and Mr. Ellsworth, alleged by the former to have occurred prior to the 21st July, 1846, (even if correct,) did not create a contract binding upon the company by which it was bound to renew the policy, in any way different from the express provisions of the policy itself. Mr. Lewis does not prove such a contract ; clear and distinct evidence of its terms ought to be given. There was no mutuality or consideration for the contract ; the premium paid was for a fixed term ; the company could not have recovered against the trustees, in an action for not renewing or paying the premium for a term subsequent to the 21st

July, 1848. At the most, it was a mere authority to, or direction from Lewis to Ellsworth to renew from time to time. It was not a contract between, and which was obligatory upon, the insurance company and the Baptist Church, by which either of them were liable in damages for a non-compliance. There was no authority on the part of Mr. Ellsworth to bind the company to renew in any mode different from the terms and conditions of the policy. No specific performance would be decreed, of this alleged verbal agreement. The company did not enter into any verbal contract with the Baptist Church, nor into any agreement other than the policy and renewals, nor did the latter come under any legal obligations to the insurance company to continue the insurance after the time specified in the last renewal certificate. By the express notice given by the insurance company, in July, 1848, that the risk would expire on the 28th July, 1848, in the absence of any further action by the Baptist Church, the insurance was terminated. (5.) Any verbal contract, negotiation or agreement, between Lewis and Ellsworth, was merged in the written renewal certificates subsequently given, which expressly referred to the policy, and continued all its provisions and conditions in full force. (6.) If the conversation between Mr. Lewis and Mr. Ellsworth, in July, 1846, created a contract by which the company was bound, at the expiration of every year, to renew the policy, it was an executory agreement whcih could not be, and was not contemplated to be performed within one year, and was therefore void. (2 *R. S.* 135, § 2.) It necessarily contemplated an insurance from 21st July, 1846, till 21st July, 1847, and to renew at the expiration of this term. The same rule applies to the conversation in July, 1847. If that was an agreement by which the company was bound to renew from 21st July, 1848, till 21st July, 1849, it is void within the statute of frauds. ( 2 *R. S.* 135, § 2, *sub.* 1. *Drummond* v. *Burrell*, 13 *Wend.* 307.) It necessarily contemplated a renewal from 21st July, 1847, till 21st July, 1848, and a renewal at the end of this term for a year more at least. (7.) There was no evidence of any general usage by which dealers with the company were insured against loss or damage

by fire, after the termination of the period fixed in the policy or in the renewal certificate, or by which the company is responsible, notwithstanding no such renewal has been executed or delivered. Such usage, if it existed, would be contrary to the policy and renewals given in the present instance, and therefore did not affect this case. (8.) The policy, and the several renewals thereof, did not constitute a course of dealing by which the company was bound to renew and is liable as having renewed the risk after the 21st July, 1848. (9.) The plaintiffs have not proved any cause of action against the defendants, or shown that they were in any manner insurers of the plaintiffs against loss or damage by reason of the destruction of their church edifice by fire on the 10th September, 1848.

II. The judge erred in charging the jury, that if such arrangement, as testified to by Mr. Lewis, was made, it was binding and valid although not reduced to writing, nor any note or memorandum in writing made thereof. Also in charging the jury that the last renewal of the policy, if made after July 21, 1847, would operate, under the circumstances stated by the court, as a contract to give a renewal on the 21st day of July, 1848, and would entitle the plaintiffs to recover.

III. The judge also erred in charging the jury, that the acts of the officers of the company, if they were in the habit of making contracts to renew policies from time to time, were binding on the company, although no express authority had been shown to make such contracts. There was no evidence to show that any such acts had ever been communicated or come to the knowledge of the board of directors.

IV. The judge also erred in charging the jury that the plaintiffs were entitled to recover if the defendants had made a legal agreement to give a renewal of insurance. The cause of action alleged in the complaint was based upon an actual extension of the policy of insurance, and not upon an agreement to give a renewal of insurance.

V. The judge erred in admitting the testimony of irrelevant conversations, which tended to the prejudice of the defendants. (1.) The conversations between Mr. Hagan and Mr. Beers, the

surveyor of the Brooklyn Fire Insurance Company, which took place after the fire occurred, were irrelevant and improperly admitted. (2.) The conversations between Mr. Sandford and Mr. Stevens, and between Mr. Lewis and Mr. Stevens, were irrelevant and improperly admitted. (*Fogg* v. *Child*, 13 *Barb. S. C. R.* 250, 251.)

VI. A new trial should be ordered, with costs to abide the event.

*J. S. Sluyter*, for the respondents. I. The agreement testified to by Mr. Lewis, and the acts of the defendants, operated as a contract to give a renewal of the policy on the 21st of July, 1848, and entitled the plaintiffs to recover. (4 *Cowen*, 646. 11 *Paige*, 556.) (1.) The last previous renewal being after the 21st of July, 1847, and an agreement being then implied to give another renewal on the 21st of July, 1848, the agreement was to be performed within the year, and was not affected by the statute of frauds. (2.) A verbal agreement to insure, or to renew insurance, made in consideration of a promise to pay the premium, is valid. Such agreements are made every day, and to hold them invalid, would hazard an immense amount of property. II. The various exceptions taken by the defendants in the course of the trial, related to the evidence adduced to prove such agreement and such acts, which evidence was competent for the purpose. (3 *Denio*, 254.)

*By the Court*, MITCHELL, P. J. The defendants, by a policy of insurance dated August 9, 1845, insured the church edifice of the plaintiffs from loss by fire from the 22d of July, 1845, to July 22, 1846, with a clause that the insurance might be continued, provided the premium should be paid and indorsed on the policy, or a receipt given for it, and that no insurance should be binding until the actual payment of the premium. The application for insurance was made to the company in July, 1845. They said they would take a risk, and that the plaintiffs might consider their building insured. The policy was delivered after this application, and was made to commence from the time of the

application, July 22, previous. The premium was not paid, nor any thing said about it, when the policy was delivered. It was not paid until February 21, 1846. Before that time the president of the company called on the treasurer of the church, who told him that he would call and pay it ; that as treasurer he was not always in funds. The president answered that he would prefer calling ; that it was his business to attend to the collection of premiums in New-York ; that he would not give the treasurer the trouble of calling ; and he subsequently called on the treasurer again and was paid. This was the beginning of a system between the parties, in which from the start the defendants waived their printed rule, that the premium must be paid before the policy should be effectual, and gave credit for the premium and declared the building insured, before the premium was paid on any policy given, and on a mere parol agreement to insure.

The defendants, after this, sent a notice to the plaintiffs that their policy would expire on the 21st of July, 1846. Before that date the president of the company again called on Mr. Lewis, the treasurer of the church, and said that the policy would expire on that day. The treasurer said he had meant to call and renew the policy. The president replied in a way that must have been intended to waive the necessity of a previous payment of the premium before the renewal should take effect, and must have been intended to be, and must have been, so understood. " Mr. Lewis," said he, " I suppose your trustees intend to *keep* this policy with us as a *permanent* risk ; to let it *remain* with us." Mr. Lewis answered, " it certainly was." The president replied he had hoped so, and supposed so ; and that he would call on the treasurer with the annual receipts or certificates. The treasurer offered to call at the office and pay, but the president replied, he would prefer calling on the treasurer. This was an agreement that the risk should be permanent and the policy continued until either should vacate it : not for one year only, but for several—from year to year. The use of the word " permanent," as to the risk, and " receipts or certificates," in the plural, show that the arrangement was to be not for one year only, but for successive years. After

this it would be a breach of faith in the company to say that the policy should not be deemed in force unless they first gave notice to that effect. Their acts led the plaintiffs to rely on them, and to defer the payment of the premium for that and for successive years until they should be called on to pay it. The president of the company did not at this conversation ask for the premium, and did not call for it until 30 days afterwards, when he left the certificate; and being then told that the treasurer was not ready to pay, he said he would call again, and did not call again until 1st September, 1846, when he was paid. Thus by the parol agreement of the parties, made a second time, the building was deemed insured from July 22, 1846, to July 22, 1847, although no certificate was given until 30 days after the first of those two dates, and no premium paid until about 8 days after the certificate was left. The company had the advantage of the agreement in 1845 and in 1846, holding the parties to pay the premium for the whole of each year, although the policy or the certificate was not given until a considerable period after the time when the policy began to run, and although the premium was not paid until a still further period. The original verbal agreement, and these acts, constituted clear evidence of a mutual understanding that each party should be bound by the agreement that the risk should be renewed at the office of the defendants, and by them, and the premium therefor paid by the plaintiffs, until either should notify the other that the agreement was to be rescinded, for the future.

Again, in 1847, the treasurer of the church received a notice that the policy would expire, as he had in 1846. The president again called on the treasurer, after this notice, and after the first renewal had expired, and handed the treasurer a renewal receipt, dated July 21, 1847. This was in August, and the receipt was for $30, instead of $25, as before. The president said he did not mean to charge more than before. The treasurer called at the office of the defendants in September, 1847, saw their secretary, and stated to him the conversation with the president as to the rate of premium. But the secretary insisted on $30, and the treasurer paid the $25, having no more with

him, and said he would call and pay the $5. The secretary replied, "at any time, at your convenience." Here again was the system of waiving immediate payment continued. The treasurer forgot about the $5, and did not call again.

Again, in 1848 a like notice was served on the treasurer that the policy would expire on the 21st of July of that year, as he had received for the two preceding years. This was no notice that the company meant not to renew, any more than the other previous notices, served in 1846 and 1847, were meant to have that effect. It was given as those were given, and as they always are given, to express the readiness of the company to renew the policy, and thus to secure the continuance of what is deemed a good customer. The treasurer, relying no doubt on the former arrangement made with the president of the company, that the risk should be permanent, and that the president would himself call for the premium, and on the former acts of the company treating the policy as really in force, from the 22d of July, in each year, although the premium was not paid until a considerable time afterwards, did not call to pay the premium, and get his renewal, and the president of the company did not call on him; and on the 10th of September, 1848, the church edifice was destroyed by fire. The witness said, in reply to a question by the defendants' counsel, that by permanent risk was meant a continuous risk from year to year until one party or the other gave notice of the discontinuance of the agreement.

The witness stated on his direct examination that he charged the whole $30, in his account with the church, and that it was allowed to him; that he reported to the church the arrangement made by him with Mr. Ellsworth, the president of the company, and that it was approved by the trustees. This was objected to. It was admissible for the purpose of showing that the trustees of the church ratified the agreement made by him; and as that was a material purpose, the objection was properly overruled.

The plaintiffs proved that the defendants had permanent policies, made verbally by the president and secretary with other parties, and which were entered in the books of the company

submitted to the directors.   This was proper, as it showed that the company had authorized their officers to make such contracts.

The secretary of the company was called by the defendants to prove facts intended to show that the company had not considered the plaintiffs as permanently insured; and on his cross-examination he was asked if on the day after the fire he had not said to Mr. Lewis that he did not deny the insurance on the church.   The question was proper, as tending to discredit his direct examination; and if it had been improper it became unimportant, as the answer made was favorable to the defendants as far as it was credited, " that the church had not been insured since July last," and that the policy then expired.

, If the president of the company testified to any thing different from the above it was for the jury to determine who, on the whole, had best recollected the facts.   He admitted that the treasurer said to him that he always wanted the policy renewed, in an interview in 1847.   This, being assented to, was an agreement in that year to renew the policy for the next year *also;* which would cover the year of the fire.   The president's notions of law probably misled him.   He said a permanent insurance was a term he did not understand, and that he did not agree with Lewis to keep the church insured.   Yet he says that in 1847 he asked Lewis if he wished the church policy renewed, and that Lewis answered yes, and that he *always* wanted it renewed.   To this the president does not state that he objected.   And he admitted that afterwards they made arrangements with persons who had an understanding with the company and promised to pay the premium.   And he says these arrangements were made with the directors, and they knew of them, but the board did not.   If he meant, as he probably did, that these arrangements were made with all the directors, it would be such knowledge of the practice, by the directors, as would bind the board.   But the board had also the books before them, showing like arrangements with others.

Testimony was also received of what the secretary of the company said when called upon on the day after the fire, in relation to the liability of the company on their agreement.   The company

First Baptist Church 'in Brooklyn *v*. Brooklyn Fire Ins. Co.

must act and speak by its officers; and what the officers say when in discharge of their duty as officers, and in relation to that duty, is evidence against the company. If the officer in a steamboat, whose duty it is to receive and deliver merchandise to be transported, is asked for an article said to have been delivered to him shortly after the arrival of the vessel at its place of destination, and he admits the receipt of the article, and makes an excuse for its non-delivery, that is legal evidence against the owners of the boat. The president and secretary of an insurance company are the officers to whom the preliminary proofs of loss are to be presented, and if after the loss and when notice of it is given, they promptly admit that they had agreed to insure the property, or to keep it insured, it is a statement made in the course of their duties, and binds the company as much as their certificate of premium paid and of a renewal would bind the company.

The complaint proceeds against the company as on an insurance effected. It should have been on an agreement to insure; but as the variance did not in any way injure the defendants, or surprise them, it was proper to treat the complaint as if it were amended, and to allow the plaintiffs to recover if they had established a valid contract to insure.

It is not necessary to inquire whether a policy of insurance must be in writing, as the plaintiffs did not, at the trial, rely on proof of a policy for the year 1848, but on the proof of an *agreement* to insure, or to execute a policy for that year. The question whether such an agreement was proved was fairly submitted to the jury : it must be assumed, therefore, to have been proved. Such an agreement may be by parol, and the reasons why a policy must be in writing do not apply to the mere agreement. It is said the agreement was executory, and not to be fulfilled within a year, and so void by the statute of frauds. If the analogy as to a parol lease of lands for several years be applied, the agreement would be valid as an agreement to insure from year to year until notice were given of its *intended* termination for the future. The agreement also was that the policies should be permanently renewed; that is, as explained, from year to year. And this was repeated in September, 1847 : so that in

Sept. 1847, there was an agreement to renew the insurance on the 22d of July, 1848. That agreement was to be perfected *by giving a certificate* of renewal, on the 22d of July, 1848, for a year from that date, and so it was to be fulfilled within a year. The thing to be done within the year was the giving of the written *agreement* or certificate to insure, and then when it was given, the obligation to pay for the loss occurring within a year after the 1st of July, 1848, would accrue. The company neglected to give this certificate, and for that neglect the plaintiffs are entitled to recover an amount equal to that which they would have been entitled to if the company had given the certificate which it agreed to give.

This was in effect the law as laid down at the trial. There was evidence enough of the usage of the company to make these permanent arrangements through their officers, and that such arrangements were known to the board and approved by them, to justify the charge of the judge on that subject. The clause in the policy, as to the mode of renewal, relates only to policies or certificates of renewal, and not to agreements to insure, and it may be, and was, waived.

The other points of the defendants, although enlarged upon *in extenso* at the trial, are covered by those here stated.

The judgment for the plaintiffs should be affirmed, with costs.

[NEW-YORK GENERAL TERM, May 1, 1854. *Mitchell, Roosevelt* and *Clerke,* Justices.]