Between THE BELLEVILLE MUTUAL INSURANCE COMPANY, appellants, and ADOLPHUS W. VAN WINKLE, respondent.

12  333
f58  110
d58  111
12  333
65L  654

The fifth section of the charter of the company provides, " that all policies, or contracts founded thereon, shall be subscribed by the president, and attested by the secretary, and the said company shall be liable for all loss or damage by fire or other casualty, agreeably to the terms thereof." The sixth section provides, " that every person who shall become a member by effecting insurance shall, before he receives his policy, deposit his promissory note for such a sum of money as shall be determined by the directors." The eighth section provides, that every member of said company shall be bound to pay for losses, and in proportion to the amount of his deposit note; and the company shall have a lien on the building insured to the amount of the note, when they shall file a memorandum with the clerk of the county.

*Held*, that the deposit of the note is a condition precedent, without which no one can become a member; and no one can be insured, directly or indirectly, without becoming a member, or at least without placing himself in a situation so that he is entitled to be a member, and is prevented by fault of the company.

As a general rule, the complainant, under a prayer for general relief, is entitled to any specific relief warranted by the frame and structure of his bill.—WILLIAMSON, C.

The directors of a mutual insurance company, or their officers, by their direction or approval, may so act as to entitle a person to become a member who, by the fault of the officers of the company, has been prevented from depositing his note, and so as to authorize a court of equity to compel his being received.

All persons applying to become members of an incorporated insurance company must be presumed to have known the terms of its charter and by-laws.

The case sufficiently appears in the opinions to make intelligible the principles decided.

The cause was argued before the Chancellor, by *Jacob Weart* and *Asa Whitehead*, for the respondent, who was the complainant in the suit, and by *Edgar B. Wakeman* and *W. Pennington*, for the appellants, the defendants below. A decree was made in favor of the complainant. The Chancellor furnished to the court the following opinion, as containing his reasons for the decree.

WILLIAMSON, C. The complainant's factory, with its fixtures and stock therein, located at Jersey City, was destroyed by fire on the 22d day of April, 1849. The complainant alleges, in his bill, that he was insured in the Belleville Mutual Insurance Company for the sum of fifteen hundred dollars. The object of this suit is to procure the benefit of that insurance. The policy of insurance, though made out and executed, was never delivered. That is the reason why a court of equity is resorted to for redress. The prayer of the bill is, that a just and true account may be taken, under the direction of this court, of the amount of the complainant's loss and damage sustained by him, by the destruction and injury, by fire, of his machinery, stock, and fixtures; and that upon such account being taken, it may be decreed that the said company shall pay to the complainant the said sum of fifteen hundred dollars, or so much thereof as may be sufficient to make good the complainant's loss and damage by the fire—to which is added a prayer for general relief.

The defendants start the preliminary objection, that independent of the merits of the case, the complainant

is not entitled to relief upon his bill, as it now stands. The ground of the jurisdiction of this court undoubtedly is to enforce the specific performance of the agreement to insure. It would have been more appropriate and formal to have prayed for a specific performance. But this is a mere formal matter, and is not essential. The bill states all the facts which are necessary to enable the court to make any decree which the complainant may be entitled to under the prayer for general relief. As a general rule, the complainant, under a prayer for general relief, is entitled to any specific relief warranted by the frame and structure of his bill. *Story's Eq. Pl.* § 41, 42, 43, *and notes.*

Is the complainant entitled to relief? It is established beyond doubt, by the pleadings and proofs, that an agreement was entered into between the complainant and the defendants for the insurance. On the 16th of March, 1849, John Kennedy, the secretary of the company, addressed the following letter to the complainant, and sent it to him by mail:

"Dear sir,—Mr. Williams informs me to-day that after consulting with the committee, they agreed to take your property at three per cent., and requested me to write you. If you agree to it, please write, and I will send you your policy at once.

Yours,     JOHN KENNEDY."

The bill alleges that the complainant answered this letter immediately by mail, accepting the proposition. There is no proof of any answer by letter. But the complainant proves that he did call upon Mr. Kennedy, and asked him if he had received his letter; and upon Mr. Kennedy's replying in the negative, the complainant said he had sent one to him, accepting the terms of the company. He then requested Mr. Kennedy to make out his policy at once. Mr. Kennedy promised he would do so. The complainant offered to pay the balance of the money required (the company having in their hands a small

amount of money belonging to the complainant). Mr. Kennedy said it was no matter; that he did not know how much the balance would be; he might hand him the money at any time. The complainant then asked him if he was insured: to which Mr. Kennedy replied—yes, most assuredly, and that he would make out the policy right away, and send it.

On the 20th of April, Mr. Kennedy wrote to the complainant as follows:

"Dear sir,—I enclose you the note. You will please have it signed, and by return mail, or as soon as you can, send it to me, with the per centage, and I will send you your policy. You will please enclose to me $7.20.

Yours,    JOHN KENNEDY."

The policy was in fact executed on the 18th day of April, and remained in the hands of the secretary, Mr. Kennedy. The note referred to in Mr. Kennedy's last letter was one of the printed notes of the company, which they always furnished their members. It was filled up for the sum of $247.50, and was to be signed by the complainant and some other individual, as surety for its payment. The letter of the 20th of April was put in the post office at Belleville on the 21st of April. On the 22d of April, and before the note could be returned, the fire occurred. Afterwards the complainant tendered the note and the amount of money required, and demanded his policy, which the company refused to deliver.

I can see no reason why the complainant is not entitled to a specific performance of this agreement. If it was entirely in parol it would be no objection to giving the complainant relief. There is nothing in the statute or in the common law requiring such an agreement to be in writing. *Sandford* v. *The Trust Fire Ins. Co.*, 11 *Paige's Ch. R.* 548; *Union Mutual Ins. Co.* v. *Commercial Mutual Marine Co.*, 2 *Curtis's R.* 324; *The Trustees of First Baptist Church* v. *The Brooklyn Fire Ins. Co.*, 18 *Barb.* 69.

But this agreement was reduced to writing. The terms

Belleville Mutual Insurance Co. v. Van Winkle.

were stated and made known in writing by the author-
ized agent of the company to the complainant, who ac-
cepted the same in writing. If the fire had not occurred
so soon after the making of the agreement there would
have been no difficulty. The defendants interpose now
no obstacle, except that the agreement was not fully ex-
ecuted when the fire occurred. It was perfectly compe-
tent for either party to have stipulated that the agreement
should not be binding until the papers were mutually ex-
changed. So far from this being the case, the contrary
was agreed upon by the parties. The secretary of the com-
pany told the complainant he was insured. It is true there
was no *executed* agreement. If there had been, there would
have been no necessity for this suit. But there was an
agreement that, upon the complainant complying with
certain terms, he should have his policy. He has com-
plied with those terms, and now asks that the defendants
may be compelled to execute the policy. They say no;
and excuse themselves on the ground that the building
was burnt. But it was through their own default and de-
lay that the complainant did not receive his policy before
the misfortune of the fire. They should be the sufferers
for their own negligence, and not the party who is inno-
cent. A company can act only through its agents. Mr.
Kennedy was their agent, and they, and not the complain-
ant, should suffer for his negligence. The agreement was
part performed. The company had in their hands a part
of the premium, and retained it on this agreement, which
they now refuse to execute.

It is insisted, by the answer, that by the act incorpo-
rating the company, the agreement was not binding until
the premium note was actually deposited with the com-
pany. The language will not admit of that construction.
The section referred to, which is the sixth section of the
act, declares, " That every person who shall become a
member of said corporation, by effecting insurance therein,
shall, before he receives his policy, deposit his promissory

note for such a sum of money as shall be determined by the directors, and that a part, not exceeding five per cent. of said note, shall be paid," &c. The complainant has never asked, and does not now ask, that the policy shall be delivered to him until he deposits his premium note as the act requires. His complaint is, that the company will not deliver to him his policy, notwithstanding his offer to fulfil his part of the agreement by a deposit of the note. The notes which the company required were notes prepared and printed by the company, and furnished to the insured. Their agent undertook to furnish the complainant a blank note to be filled up. His delay has caused all the difficulty, and a court of equity ought to protect him. A court of law cannot. It is the refusal of the company to comply with their part of the agreement of which the complainant complains. If, after the agreement was made, the complainant had refused to deposit his note, the company could have enforced the agreement, and compelled him to give the note. If a loss had occurred to any other member of the company, the company could have assessed a proportion of such loss upon this note, and might have appropriated the whole of it to meet the loss, if so much had been required for the purpose. If the company could have subjected the complainant to the burthen of the agreement, it is equitable that he should be entitled to enforce it for his own benefit.

· The agreement was *bona fide* entered into by the parties. Both parties considered the complainant insured. The complainant rested securely upon the representations of the officers of the company and upon the agreement being carried out in good faith.

The complainant is entitled to a specific performance of the agreement. There being no dispute between the parties as to complainant having taken all the preliminary steps to entitle him to a remuneration of his loss, if he is entitled to the policy, he is entitled in this suit to recover the same amount as he would be in an ac-

tion at law upon the policy. Let there be a proper refer-
ence to a master for that purpose.

From this decree an appeal was taken, and the cause
on appeal was argued by *J. P. Bradley* and *W. Penning-*
*ton*, for the appellants, and by the same counsel as in the
Court of Chancery for the respondent.

The opinion of the court was delivered by

ELMER, J.  The company alleged to have made the
agreement to insure, sought to be enforced in this case,
is a mutual company, the fifth section of whose charter,
*Acts of* 1839, 118, provides, " that all policies, or contracts
founded thereon, shall be subscribed by the president, and
attested by the secretary, and the said company shall be
liable for all loss or damage by fire or other casualty,
agreeably to the terms thereof." The sixth section pro-
vides, " that every person who shall become a member by
effecting insurance shall, before he receives his policy,
deposit his promissory note for such a sum of money as
shall be determined by the directors." And the eighth
provides, that every member of said company shall be
bound to pay for losses, &c., in proportion to the amount
of his deposit note, and the company shall have a lien on
the building insured to the amount of the note, when
they shall file a memorandum with the clerk of the
county.

In my opinion, the meaning of these provisions are, that
every person effecting insurance in the company must
become a member of it, and deposit his premium note,
as required. The aggregate of these notes forms the capi-
tal to which all the members look for their security. In
the nature of things, a deposit of the note is a condition
precedent, without which no one can become a member;
and no one can be insured, directly or indirectly, without
becoming a member, or at least without placing himself
in a situation so that he is entitled to be a member, and
is prevented by the fault of the company. No mere agree-

ment to insure can effect this. So to hold is to render nugatory the plain requirements of the act, which are, that policies shall be signed by the president, and attested by the secretary, and that the insured shall deposit his note before he receives the policy. Hence all the testimony introduced into the case of the general usage of insurance companies having no such restrictions in their charters to consider the insurance as commencing when the terms are mutually agreed upon, and all the cases, at law or in equity, enforcing such agreements are inapplicable. No previous case has gone the length of the decision of the Chancellor in this. The case of *Durar* v. *Insurance Co.*, 4 *Zab.* 193, before the Supreme Court, was the case of a mutual company having a charter very much like that now before us. It was there held, that where there was a transfer of the property and an assignment of the policy assented to by the secretary entered on the books of the company, and acts done which implied that the directors were satisfied with the original note, a new note was not necessary to make the assignee a member; but there was no intimation that a mere agreement to insure without the deposit of any note would be sufficient to constitute an original member, or that such an agreement would bind the company.

The case most relied on by the counsel of the appellees was that of *Union M. Ins. Co.* v. *Commercial M. Ins. Co.*, 19 *How.* 318. But in that case no question was made about a premium note, nor did the charter of the insuring company require its deposit. It was held that, under the Massachusetts statute, a mere agreement to insure bound the company, and this was not denied in the answer. The constant usage of the company was to intrust the president with the power to bind them by a verbal agreement.

But I do not doubt that the directors of a mutual company, or their officers, by their direction or approval, may so act as to entitle a person to become a member who, by their fault, has been prevented from depositing his note;

and as to authorize a court of equity to compel his being received, or to give the same relief he would be entitled to if he was. These companies are just as much bound to act with good faith as any others. It remains therefore to inquire whether, as was insisted for the appellee, the facts proved show a want of good faith on the part of the company, and entitle him to a decree on that ground.

A previous application for insurance it appears had been made while the stock and machinery was in the township of Aquackanonk. Whether it was or was not effected is immaterial, the property having been removed into the township of Van Vorst, where it was burnt. After this removal, the appellee applied to the secretary for a renewal of the policy. A correspondence ensued, and on March 16th, 1849, Mr. Kennedy, the secretary, wrote to him as follows: " Mr. Williams informed me to-day that, after consulting with the committee, they agreed to take your property at three per cent., and requested me to write you. If you agree to it, please write, and I will send you your policy at once." There is no proof of any answer to this letter, but there is evidence that he called on the secretary, and asked him if he had received his letter; and upon his replying in the negative, the appellee told him he had sent one accepting the terms, and requested him to make out the policy at once, offering to pay the money required. The secretary promised to do so, and said it was no matter about the money; he did not know how much the balance would be—he might hand it to him at any time. The appellee then asked him if he was insured, to which the secretary replied—yes, most assuredly—and he would make out the policy right away, and send it.

A policy was made out in full, and placed in the secretary's hands, dated April 18th. On the 20th, the secretary wrote to the appellee, enclosing the usual printed note, properly filled up, as follows: " I enclose you the note. You will please have it signed, and by return mail, or as

2 F*

soon as you can, send it to me with the percentage, and I will send you your policy. You will please enclose me $7.20." This letter was put in the post office at Belleville on the 21st, and on the 22d, before the note could be returned, the fire occurred. On the same day the appellee tendered the note, signed by himself and a competent surety, and the money required, and demanded his policy.

Mr. Kennedy, who was examined as a witness for the company, does not confirm the testimony of the other witnesses, but, assuming it to be satisfactorily proved that the secretary did tell the appellee, previous to the 20th of April, that he was fully insured, and that he sometimes told other persons the same thing under like circumstances, and that some of the directors of the company had occasionally made similar declarations, I cannot regard these facts as sufficient to fix the blame on the company of the nondelivery of the premium note and policy. The appellee, like all others applying to become members of the company, must be presumed to have known the terms of their charter and by-laws. *Angell,* § 10. These expressly forbade any person becoming a member until the premium note was deposited. No officer had any right to dispense with this condition, and no person had any right to rely on assurances that it could be done. If this be admitted, charters and by-laws are of no value. I do not doubt that the directors of such company may dispense with them, so far as to bind the company to make good damages occasioned by their conduct, or the conduct of officers, which they have sanctioned, acting in violation of them. This is implied in holding them liable for a fraud. But the sanction of the directors to acts violating the charter and by-laws is not to be presumed. To enable a party to claim on such a ground, it must be satisfactorily proved. In this case there is no proof that the directors ever authorized the declarations alleged to have been made by their officers, either before they were made, or by adopting and sanctioning them afterwards. No

doubt the common usage of joint stock companies, of considering an insurance as commencing when the agreement was perfected, was often inadvertently supposed to apply to this company; but, in my opinion, those who acted on this supposition did so at their own peril. Bound to know the terms of the charter and by-laws, as the appellee was, it was his duty to see that the premium note was duly made and deposited, and he had no right to wait until it was sent to him by the secretary.

POTTS, J. The question in this case is, whether the contract of insurance was completed between these parties, or merely in process of negotiation when the company stopped, and refused to accept the consideration and deliver the policy. Had both parties gone so far as to be absolutely bound?

There is no doubt the parties had *agreed for* a contract of insurance. It is equally clear the contract itself had never been entered into. The preliminaries had been settled, but there had been no consummation. Van Winkle had applied to the company for an insurance; the company had fixed the rate of premium, and Van Winkle had assented to it. But there the matter stood when the fire occurred, and the company refused to proceed further. On Van Winkle's part, the per cent. required in cash had not been paid, nor the note with security given or tendered, or even executed. On the part of the company, the policy of insurance, though executed, had not been delivered.

Then can a mere naked agreement for a policy of insurance, where nothing more is done on either side, be enforced in equity against this company after the property sought to be insured has been lost by fire?

The sixth section of the charter provides, " that every person who shall become a member of said corporation, by effecting insurance therein, shall, *before he receives his policy,* deposit his promissory note for such a sum of mo-

ney as shall be determined by the directors, and that a part, not exceeding five per cent. of said note, shall be paid." The charter is the fundamental law of the company. The legislature has chosen to prescribe the terms on which insurances shall be made; and in the charter itself the deposit of the premium note, and the payment of five per cent. of said note in cash, is made a *condition precedent* to the completion of the contract of insurance. Nor is this condition to be construed as directory merely. In these mutual companies, the premiums paid or secured constitute the whole capital of the corporation—the fund upon which they are to do business, and out of which losses are to be paid; and unless the capital is thus paid in or secured there is no basis laid upon which a legitimate business can be done. For a company to enter into contracts of insurance without first requiring the means to be provided out of which to pay losses would be a sheer imposition upon the public.

The legislature clearly did not intend to permit this. The whole scope of the charter shows that the legislature intended to make the contribution to the capital of the company a condition precedent to the power to insure. The twelfth section provides, that no policies shall be issued by said company until application shall be made for insurances to the amount of fifty thousand dollars at least. The eighth section provides, that every member shall be bound to contribute for losses sustained in proportion to the amount of his deposit note; and that the company shall have a lien, in the nature of a mortgage, on all buildings insured, and the lands on which they stand, to the amount of his deposit note, from the time a record is made in the clerk's office of the county. These provisions, taken in connection with that already cited from the sixth section, that the premium shall be deposited before the policy issues, can have no other reasonable construction than that, under this charter, the required deposit must be actually made before a policy of insurance can issue or the contract of insurance be complete.

This construction is also in accordance with other parts of the charter. By the fifth section, policies, or contracts founded thereon, to be binding and obligatory on the company, are required to be signed by the president and secretary; and for losses sustained the company is to be held liable, agreeably to and on such terms and conditions as shall be contained in the policy. And the ninth section authorizes suits against members for the collection of their deposit notes, or any assessment thereon. The liability of the members is predicated only on their *deposit notes*, that of the company upon *policies* issued.

The very principle upon which these mutual insurance companies are founded requires that this construction be adopted. They are associations of persons formed for the purpose of indemnifying each other against loss. Mutuality is the basis of association. The contribution which each member makes forms, in the aggregate, the fund out of which indemnification is to be made. Contribution is therefore the necessary condition of membership—of title to indemnity. For if there is no contribution there is no provision for indemnity. The charter prescribes the mode of contribution—five per cent. in money—ninety-five per cent. in notes, with security. Mr. Van Winkle insists it is sufficient if he *agrees* to pay the five per cent. and gives the note; that *that* entitles him to membership and to indemnification. If this is a compliance with the charter in his case, it would be in the case of every other member; and we might have a mutual insurance company operating without a dollar of capital ever having been actually contributed, either in cash or securities. An anomaly like this surely never was contemplated by the legislature.

I am therefore of opinion, that before a corporation of this description, under such a charter, can lawfully make a contract for insurance, the contribution required by the charter must be actually made by the party seeking to insure. And that even if the secretary, or a majority of the

executive committee, agreed in this case to insure Mr. Van Winkle in advance of any compliance with the condition requiring contribution on his part, such agreement is not binding on the corporation, and cannot be enforced. They transcended their authority when they pledged the property of the actual contributors to make good the losses of one who had contributed nothing, contrary to the spirit of the charter.

I agree that the actual delivery of the policy to the party is not necessary to fix the company's liability. If an agreement to insure had been shown, and Mr. Van Winkle had performed his part of the contract by paying and satisfactorily securing the premium agreed on, he would have been entitled to relief. Or if, in pursuance of instructions, he had deposited the money and note to their credit in bank, or in the hands of a messenger or agent, or sent it by mail, the company might have been compelled to perform the contract on their part. But the difficulty is, Van Winkle did nothing of the kind; he had in no sense performed his part of the contract when the fire occurred. He had neither, actually nor constructively, paid or secured anything to the common fund, and therefore, at the time the fire occurred, he was not entitled to indemnity out of that fund, for contribution was a condition precedent to the contract of indemnity, and could not be waived.

I put my opinion in this case upon the ground that this is a mutual insurance company, and that the sixteenth section of the charter prohibits the delivery of any policy of insurance until the required premium is paid and secured. This provision is for the safety of parties actually insured—imposes in its operation no hardship or inconvenience to anybody, and is right and reasonable in itself. For he ought not to claim indemnity, among mutual insurers, who has not put himself in a condition to make indemnity. And I think it is no answer to say, that in this case contribution might be compelled by a suit

either at law or in equity. Such a remedy, for all practical purposes, where the sum to be recovered is so small, and the delay and expenses attending it may be so great, is worthless.

The decree should be reversed.

The following dissenting opinion was delivered by

CORNELISON, J.   I am of opinion, in this case, that the decree of the Chancellor should be affirmed.

Adolphus W. Van Winkle, the complainant in the Court of Chancery, was insured in the Belleville Mutual Insurance Company, on the 12th day of August, 1848, for the period of five years from that day, for the sum of $1500, on the machinery, stock, and fixtures in a building situate at Aquackanonk, New Jersey, and also on certain household furniture in the house of Isaac Van Derbeck, of the same township, from the 1st of January, 1849. Mr. Van Winkle, the insured, determined to change the location of his factory from Aquackanonk to the township of Van Vorst, Hudson county, and such change was accordingly made. In consequence of such change the first policy became void, and thereupon Mr. Van Winkle desired to have his machinery, stock, and fixtures again insured by the same company in the place to which they had been removed.

The negotiation for the new insurance was commenced after the removal of the machinery, stock, and fixtures, and it appears, by the testimony, that in the month of March, 1849, the company agreed to insure W. Van Winkle again. The agreement, on the part of the company, is manifested by the letter of Mr. Kennedy, their secretary, which was mailed to Mr. Van Winkle on the 16th day of March, and received by him.

The following is a copy of that letter:

"Dear sir,—Mr. Williams informs me to-day that, after consulting with the committee, they agree to take your

property at three per cent., and requested me to write to you. If you agree to it, please write, and I will send you your policy at once.

Yours,    J. KENNEDY."

It is alleged by the complainant in the Court of Chancery that he answered this letter, agreeing to the terms of insurance proposed by the company. But the letter of acceptance is not, however, in proof. Nevertheless there is affirmative proof that Mr. Van Winkle told Mr. Kennedy, the secretary of the company, that he accepted the terms proposed in the letter of Mr. Kennedy, and requested that the policy should be prepared. Mr. Van Winkle then offered to give Mr. Kennedy the balance of the money. It seemed there was to be a note given for part of the premium, and Mr. Kennedy said it did not make any matter—he would make it out, and send it to him, and he might hand him the money at any time—and then Mr. Van Winkle asked him if he was insured. Mr. Kennedy said yes, most assuredly.

It also appears, by the testimony of the witness, that one reason why the money was not taken was because Mr. Kennedy wanted time to make some calculation as to the amount of the premium. Mr. Kennedy nevertheless declared that Mr. Van Winkle could hand it to him at any time—it would make no difference. Such is the testimony of Mr. Snyder.

The weight of the testimony is to the effect that Mr. Van Winkle proposed to have certain property insured. Such proposals were attested, and that there was a clear and definite agreement by parol to insure on the part of the company, the terms of which were mutually acquiesced in by the company and the party to be insured. Numerous cases show that such agreements can be enforced by bill in equity for the specific performance of a contract.

After the agreement, and before any policy was delivered by the company to Mr. Van Winkle, and on the 22d

of April, 1849, the property was destroyed by fire. The policy was made out, and signed on the 18th of April, 1849, and remained in the possession of the company. Before the premium note could be returned to the company, the property was destroyed. But the note was subsequently *tendered.*

The company principally rely in their defence to this demand, or the clause in their charter, which is as follows: that every person who shall become a member of said corporation, by effecting insurance therein, shall, before he receives his policy, deposit his premium note for such a sum of money as shall be determined by the directors, and that a part, not exceeding five per cent. of said note, shall be paid.

In my opinion, the terms of the charter of the company do not prevent the appellee, Mr. Van Winkle, maintaining the remedy he has sought by his bill in Chancery. Both in law and in practice, corporators can now, and do frequently by agents, enter into contracts by parol. Is this company so powerless that it cannot agree to insure? and do proposals to insure, surveys for insurance, and the acceptance of proposals by the company, amount to nothing?

But the company say that their proposed negotiations and the agreement were not consummated by a policy, and therefore they are not bound. The complainant sets forth, in his bill, his agreement with the company—he proves it—he states that it is equitable and just that it should be carried into effect. Cannot this agreement be carried into effect by the direction of the Chancellor, that the company shall receive the premium money and the note, and issue and deliver the policy to the insured, and at the same time award the complainant the amount of his loss, or if necessary, when the policy is delivered to Mr. Van Winkle, leave Mr. Van Winkle to his remedy upon it?

Mr. Van Winkle, having done what was requisite and

necessary on his part, is entitled to have the agreement to insure consummated, if necessary, by the delivery of the policy dated at the time of the agreement.

The Chancellor can order that a policy be delivered, and the strict terms of the charter will then be complied with, and at the same time can take proper steps to ascertain the amount of the loss sustained by the insured. Right and justice will in this way be carried out, and, in my opinion, according to law.

The decree of the Chancellor was reversed by the following vote:

*For affirmance*—Judge CORNELISON.

*For reversal*—Judges GREEN, ELMER, OGDEN, POTTS, RYERSON, HAINES, SWAIN, VALENTINE, VREDENBURGH, RISLEY.