(4 App. Div. 516)

### SHANK v. GLENS FALLS INS. CO.

(Supreme Court, Appellate Division, Fourth Department. April, 1896.)

INSURANCE—AUTHORITY OF AGENT—CONTRACT TO INSURE.

An insurance agent authorized "to receive proposals for insurance * * * and to fix rates of premium, tc receive moneys, and to countersign, issue, and consent to the transfer of policies of insurance signed by the president and attested by the secretary" of the company, cannot, by virtue thereof, bind the company by an agreement to renew a policy without further application, and keep the same in full force until further notice.

Action by Emily Shank against the Glens Falls Insurance Company. From an order rendered in favor of plaintiff at the Cayuga circuit defendant moves for a new trial on exceptions ordered to be heard at general term in the first instance. Granted.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

William E. Hughitt, for plaintiff.
Frank D. Wright, for defendant.

FOLLETT, J. January 25, 1895, this action was begun to recover the value of a dwelling house destroyed by fire, which, it is alleged, the defendant insured. April 2, 1869, Calvin Coburn was appointed an agent for the defendant by a written instrument, of which the following is a copy:

"Glens Falls Insurance Company.

"Be it known that Calvin Coburn, of Union Springs, in the county of Cayuga, and state of New York, is appointed, and by these presents duly constituted, agent of the Glens Falls Insurance Co., of Glens Falls, N. Y., with full power to receive proposals for insurance against loss and damage by fire in Union Springs and vicinity, and to fix rates of premium, to receive moneys, and to countersign, issue, and consent to the transfer of policies of insurance, signed by the president and attested by the secretary of the Glens Falls Insurance Company, subject to such rules and regulations of said company, and to such instructions as may from time to time be given by its officers. In witness whereof, the said Glens Falls Insurance Company have caused the same to be signed by their president and attested by their secretary in Glens Falls, in the state of New York, this second day of April, A. D. 1869.
"[L. S.]                              R. M. Little, President.
"C. Newton Locke, Secretary."

Under this appointment Coburn has continued to act as defendant's agent. He testified, "I never received any instructions or

powers excepting in this paper" (referring to the commission). April 12, 1893, Coburn countersigned a New York standard policy, which had previously been signed by defendant's president and secretary, by which the defendant, in consideration of $3, insured from April 12, 1893, to April 12, 1894, against loss or damage by fire, the plaintiff's frame dwelling house to an amount not exceeding $400, and her frame barn to an amount not exceeding $100. The policy contains the following provisions which are pertinent to this litigation:

"In any matter relating to this insurance no person, unless duly authorized in writing, shall be deemed the agent of this company. This policy may, by a renewal, be continued under the original stipulations, in consideration of premium for the renewed term, provided that any increase of hazard must be made known to this company at the time of renewal, or this policy shall be void. * * * No officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached thereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached. In witness whereof, this company has executed and attested these presents this 12th day of April, 1893, but this policy shall not be valid until countersigned by the duly-authorized agent of the company at Union Springs.

"Union Springs, April 12, 1893.            J. L. Cunningham, President.
                                           "R. A. Little, Secretary.
   "A. Coburn, Agent."

August 5, 1894,—3 months and 23 days after the expiration of the policy,—the dwelling was totally destroyed by fire. It is alleged in the complaint that about April 12, 1893, the plaintiff and defendant entered into an agreement in consideration of the payment of $3 per year, by which the defendant undertook to insure the plaintiff by a policy of insurance in the sum of $400 on her house and in the sum of $100 on her barn, from year to year, and at the same time promised and agreed to renew the policy without further application, and keep the same in full force until further notice. It is also alleged that thereafter the defendant duly issued and delivered to the plaintiff its policy No. 2,425, which purported to be a standard fire insurance policy of the state of New York, by which the defendant insured the plaintiff in the amount aforesaid from April 12, 1893, to April 12, 1894, and that at the expiration of the policy she was ready and willing to renew the same, and that by force of the agreement the same was renewed, and was in full force at the time of the fire. The defendant admits that it issued the policy described, but denies that it agreed to keep the same renewed from year to year, and alleges that due proofs of loss were not served, as provided by the policy. The defendant's agent testified that April 11, 1893, the plaintiff called at his house, and applied for insurance on the property, and that he informed her that he would examine it, determine the amount for which it could be insured, and at what rate. He says that he immediately examined the property, and on the next day (April

12th) called on the plaintiff, told her the amount and rate, and advised her to take a policy for three years, as it would cost only about twice as much as a policy for one year, but that she declined a policy for three years, on the ground that she expected to sell the property. He testified that after this conversation, and on the same day, he issued the policy, reported it t the company, and on the next day (April 13th) delivered it to the plaintiff at her house. The plaintiff testified that she had two conversations with the agent; one before he inspected the property, and the other on the day when he delivered the policy. She does not fix the date of either interview, but says that the last, when the policy was delivered, occurred in the latter part of April or early in May, 1893. Her corroborating witness, who was present when the policy was delivered, says that the interview was in April or May. Upon her cross-examination the plaintiff was uncertain as to the date of the delivery of the policy, and testified that only three or four days intervened between the two interviews described by her. It is not, however, important whether the interview occurred on the day after the date of the policy or several days thereafter. The plaintiff testified:

"He [defendant's agent] came to our house that day, and he said, 'I have been down and looked your property over, and I have brought over the policy;' and he said that he would insure me; and I said to him, 'I can't take it only for one year, but I want it kept yearly,' but I couldn't pay only for one year at each time; and then he said he would take—he said he rather I would take it for three years. I told him I couldn't, on account that I didn't have the means. * * * Then I repeated to him that I wanted him to keep it renewed, and he said he would. I repeated it two or three times. Then when he got ready to go away I repeated it again. He said he would, and then I told him I didn't understand business very much, and I always left it to agents to see to it for me. He said 'Yes,' he would see to it. Then I said to him I didn't want it to run out as long as I held it, because I talked of selling it. I didn't want it to run out, and if I should sell it I would notify him that I had sold it. * * * Then I asked him again, I said, 'Now, I shan't have to pay no attention to this,' and he said, 'No;' and I couldn't think of any more, and I thought that ought to be enough. Then I said to him, 'Then I won't have to look after this at all?' * * * He said, 'No;' that was his business."

A Mrs. Stout was present at this conversation, and corroborated the plaintiff's version of what was said. This is the contract upon which the plaintiff seeks to recover, and this is the only evidence of its existence. The defendant's agent denied that he had any such conversation with the plaintiff, and swore that he never agreed to keep the policy renewed. The court instructed the jury:

"The only question which I shall submit for your consideration is, was there a contract made between the plaintiff and the agent of the insurance company at the time the policy was issued, as claimed by the plaintiff, which was, in substance, that the agent of the defendant would renew the insurance policy for two years longer, providing the plaintiff would take an insurance policy on her buildings for one year?"

No question in respect to the value of the property, or in respect to the service or the waiver of the service of due proofs of loss, was submitted or requested to be submitted to the jury, but the court was requested by defendant to charge, as a matter of law,

that the plaintiff had not furnished proofs of loss as required by the policy, which was refused, and an exception taken. The issue of fact submitted to the jury was found for the plaintiff, and a verdict for $409 rendered.

Four questions are presented by the record:

(1) Had Coburn authority to bind the defendant by his oral promise to keep the policy renewed?

(2) Is the evidence sufficient to sustain the finding that Coburn agreed that the defendant would keep the policy renewed?

(3) Is the oral contract void under the statute of frauds, or under the 121st section of the insurance law of this state (chapter 690, Laws 1892), which prescribes that a standard fire insurance policy, the form of which is on file in the office of the secretary of state, shall be issued by insurers of property in this state, and further provides:

"No fire insurance corporation, its officers or agents, shall make, issue or deliver for use, any fire insurance policy or the renewal of any such policy on property in this state, other than such as shall conform in all particulars as to blanks, size of type, context, provisions, agreements and conditions with such printed blank form of contract or policy filed in the office of the secretary of state; and no other or different provision, agreement, condition or clause shall be in any manner made a part of such contract or policy, or indorsed thereon or delivered therewith, except as follows, to wit."

The exceptions which follow have no relation to the questions involved in this case.

(4) Were the proofs of loss furnished sufficient?

A contract of insurance is one thing, and a contract to insure is quite another thing. The former is executed and takes effect immediately, while the latter is executory; and the liabilities arising out of these contracts are not always the same. May, Ins. (3d Ed.) § 45; Thomas, Neg. 683; Bank v. Hand, 80 Hun, 584, 30 N. Y. Supp. 508; Id., 89 Hun, 329, 35 N. Y. Supp. 449. The extent of Coburn's authority is defined by the power of attorney and by the policy, and the uncontradicted evidence is that he had no other or greater powers than those conferred by these instruments. He had power to countersign and issue policies of insurance which had been previously signed by the president and secretary of the defendant, but the power is not broad enough to authorize him to bind the defendant by an executory, oral contract to insure property in the future. The policy provides:

"No officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy, except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto; and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions, unless such waiver, if any, shall be written upon or attached thereto; nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

By the express terms of the policy it expired April 12, 1894, and the provision above quoted excludes the idea that an agent may orally contract that a policy shall be continued in force beyond the period when by its terms it expires. The terms of the policy do

not provide that oral contracts to renew the policy "may be the subject of agreement," and such a promise, had it been made by Coburn, and indorsed, would not bind the company unless ratified by it. There is no evidence in the case that Coburn had ever assumed to bind the defendant by an executory, oral contract to insure, or that he ever assumed to bind the defendant to keep policies renewed. So far as it appears, the policy in suit is the only one ever issued by the defendant to the plaintiff, and there is no evidence that Coburn ever issued to the plaintiff a policy in any other company. There was no attempt made to show a course of dealing between the defendant and its customers, or between it and its agents, which would authorize a jury to infer that Coburn's power was broader than that expressed in the power of attorney and in the policy. The contract sought to be enforced is so unusual that it cannot be presumed to be within the power of an agent, acting under an express and limited authority, to make. If local agents of insurers possess such power, the companies can never know the extent of their liabilities. The history of insurance litigation presents no case in which such authority has been claimed under a power of attorney like the one in the case at bar. In Trustees of First Baptist Church v. Brooklyn Fire Ins. Co., 19 N. Y. 305; Id., 18 Barb. 69, 23 How. Prac. 448; Id., 28 N. Y. 153,—a contract to keep the policy renewed was made directly with the insurance company, through its president, and the power of the president was not the question on which the decision of the case turned. The plaintiff failed to show that Coburn had power to bind the defendant by the promise which the jury found that he made.

·Again, the promise testified to is not, in form or substance, the promise of the defendant, but it is the individual promise of Coburn; and the testimony is insufficient to sustain the finding that by it Coburn undertook to bind the defendant, or that the plaintiff understood that he assumed to bind it. The just and natural construction of the conversation—not an unusual one between those who insure and insurance agents—is that Coburn undertook for himself to see to it that the policy should be renewed at its expiration. His promise, if made as testified to, was his promise, and not the promise of the defendant.

Without considering the third and fourth questions, we think, for the reasons above given, that the court erred in refusing to dismiss the plaintiff's complaint, that the defendant's exceptions should be sustained, 'and that a new trial should be granted, with costs to abide the event.

ADAMS and GREEN, JJ., concur. HARDIN, P. J., and WARD, J., concur in result.