WILLIAM D. GRISWOLD, Appellant, v. AMERICAN CENTRAL INSURANCE COMPANY, Respondent.

January 31, 1876.

1. The building insured was described as a "two-story frame dwelling-house, on west side of King's Highway, near present terminus of Lindell avenue, St. Louis, Mo." After insurance and before destruction it was moved 200 feet north. The same description was as applicable after as before its removal. *Held*, that the effect of the removal upon the risk was not a question of law, but of fact, there being no condition or covenant in the policy that the building should remain where it was.

2. A effected insurance with B, and shortly afterwards caused a memorandum

7

to be made in writing on the policy, with the consent of B, that the loss, if any, was to be paid to C. *Held*, that C was not the assignee of the policy, but was the party to whom the loss, if any, was payable.

3. If this memorandum was made as collateral security to C, for a debt owing him by A, payment of the debt will, without more, enable A to recover to his own use any loss on the policy.

4. During the time when the debt to C continued unpaid, A sold to D the property insured, informed B thereof, and caused a memorandum to be made on B's policy register, stating the value of the policy and that it was transferred to D. *Held*, that this memorandum, made by B, operated as an assignment of the policy to D.

5. The debt to C was paid by D, after which the property was destroyed by fire. *Held*, that D was entitled to recover the loss.

Appeal from the St. Louis Circuit Court.

*Reversed and remanded.*

*Bell & Thompson*, for appellant, cited : Fogg *v*. Middlesex Ins. Co., 10 Cush. (Mass.) 346 ; Grosvenor *v*. Ins. Co., 17 N. Y. 391 ; Solmes *v*. Rutgers Ins. Co., 40 N. Y. 416 ; Northrup *v*. Mississippi Valley Ins. Co., 47 Mo. 435.

*Rankin & Hayden*, for respondent, cited : Hale *v*. M. Mutual Fire Ins. Co., 6 Gray (Mass.), 169 ; Fogg *v*. Middlesex Mutual Fire Ins. Co., 10 Cush. (Mass.) 337 ; Macomber *v*. C. M. Fire Co., 8 Cush. (Mass.) 135 ; Sillem *v*. Thornton, 3 El. & Bl. 868 ; Robinson *v*. M. C. Mutual Ins. Co., 3 Dutch. (N. Y.) 134 ; Clark *v*. M. Ins. Co., 2 Woodb. & M. 472.

Gantt, P. J., delivered the opinion of the court.

This suit was on a policy of insurance on a dwelling-house of Cabanné against loss by fire for a period of five years from May 24, 1870. The premium for the whole time, $80, was paid when the policy was issued. The sum insured was $4,000. The property was described as "his two-story frame dwelling-house on west side of King's Highway, near present terminus of Lindell avenue, St. Louis, Mo." Cabanné was, in May, 1870, the owner of the property. On August 6, 1870, he borrowed money from Fuchs, executed to him a deed of trust conveying land adjoining that on which the house stood, or the

land itself, and on August 8, 1870, the following mem-orandum was made on the face of the policy: "Aug. 8th, 1870. Loss, if any, made payable to F. Fuchs. G. T. Cram, Sec'y." Fuchs seems to have had possession of the policy from this date to July, 1875. In September, 1871, Cabanné sold all his land on the west side of King's Highway to Griswold, subject to the incumbrance in favor of Fuchs, and attempted to put Griswold in his place, in all respects, in relation to the land and this policy of insurance. He says he wished to turn over to Griswold "all the papers." At this time Fuchs seems to have been in Europe, and Cabanné appears to have forgotton that he had the custody of the policy. Not being able to find it, he thought it was lost or mislaid. In pursuance of his purpose to substitute Griswold for himself, in respect of the land and its incumbrances, he went to the office of defendant in September, 1871. He has no accurate memory of what he did there. He says in general terms that he did whatever was required of him; and what that was we may infer from the following entry on the policy register of defendant: "No. 3550. Name, J. Charles Cabanné. Term, five years. Commencement of risk, May 24, 1870. Expiration of risk, May 24, 1875. Amount insured, $4,000. Rate, 2 per cent. Amount of premium, $80. On his two-story frame dwelling on west side of King's Highway, near present terminus of Lindell avenue, St. Louis, Mo. August 8, 1870. Loss, if any, made payable to F. Fuchs. G. T. Cram, Sec'y, etc. September 25th. Transferred to Wm. D. Griswold." In November, 1872, the house was totally destroyed by fire. Just before the fire, it had been removed from the spot it occupied when insured to another, some 150 feet north of it. In its new position it was still "on the west side of King's Highway, near the present terminus of Lindell avenue."

Proof of loss was made by Griswold, and, payment being refused, suit was brought on the policy, in the name of

Fuchs. In July, 1875, Griswold paid to Fuchs the debt secured by the deed of trust and the policy, and received from him the latter paper. On November 17, 1875, an amended and supplemental petition was filed in the name of Griswold, and upon it the suit was tried. The facts above detailed appeared in evidence, and the court declared that upon them the plaintiff could not recover. The plaintiff excepted, and appealed to this court. The question is: Did the facts in evidence tend to establish a right of recovery in the plaintiff?

We have no doubt that if, at any time after August, 1870, and before September, 1871, the property insured had been destroyed by fire, Fuchs might have recovered for the loss. He was not, in strictness, the assignee of the policy. The relations of insurer and insured continued between Cabanné and the defendant, notwithstanding the memorandum of August 8, 1870. The effect of the memorandum was to make Fuchs the payee of the loss, if any, by fire, contemplated by the contract subsisting between Cabanné and the defendant; and any act done by Cabanné to vitiate the insurance would defeat Fuchs' right to receive the loss. *Fogg* et al. v. *Middlesex Mutual Fire Ins. Co.*, 10 Cush. (Mass.) 337; *Hale* v. *Mechanics' Mutual Fire Ins. Co.*, 6 Gray (Mass.), 169. Although Fuchs must sue in his own name, in case of loss, yet Cabanné may be regarded as his trustee for certain purposes. The memorandum designating Fuchs as payee was made when he became the creditor of Cabanné, and the incumbrancer of the property; and his interest in the policy terminated when his debt was paid by the owner of the property, whether Cabanné or his vendee. Prior to this payment, Fuchs was the only person in whose name suit could be brought to recover the loss. When this payment was made, it operated a transfer to Cabanné, or his vendee, of all Fuchs' interest in the policy. *Holland* v. *Smith*, 6 Esp. 11.

2. When, on the 25th of September, 1871 (the *year* is

fixed by the testimony of Cabanné, the *day* by the memo-
randum on the policy register), Cabanné visited the office of
defendant, he had sold the property insured to Griswold.
We are forced to infer, from what appears, that he informed
the defendant of this, and signified his wish. to substitute
Griswold for himself in the policy. We are forced also to
infer that the defendant assented to this, waiving all objec-
tion founded on the interval which had elapsed since the
sale, .Of course the only effect of such a substitution was
to continue Fuchs, so long as the debt to him was unpaid,
the payee of the loss, to recognize Griswold as the owner
of the house and policy, subject to this debt, and as the
beneficiary of the policy for the purpose of its discharge.
Griswold was interested directly in keeping the insurance
alive. The defendant was at liberty, as suggested by its
counsel, to decline continuing the insurance after Griswold
took Cabanné's place, but it did not do this ; on the con-
trary, it assented to the transfer of the policy to Griswold
(subject always to Fuchs' incumbrance), and the considera-
tion of this assent was the continuing of the insurance.
Otherwise, a ratable part of the premium paid at the com-
mencement of the risk might have been claimed by Cabanné
or his vendee. It is, of course, a pity that so much was
left to inference. A very little attention would have made
unequivocally plain much which is now to be gathered from
*indicia*, more or less faint, of the meaning of the parties ;
but we are of opinion that all the facts on which we found
our judgment may be fairly inferred from what this record
discloses. On September 25, 1871, no memorandum was
made on the policy itself. It seems to have been in the
hands of Fuchs, and he was abroad. The entry on the
register was very persuasive evidence of the intention of the
defendant, and we have no doubt of it. It was not essen-
tial that this intention should be manifest by an instrument
of writing signed by defendant. In this respect the insur-
ance company and an individual are upon the same foot-

ing; and a contract may be inferred from circumstances in the case of the one precisely as in the case of the other. Sec. 6 of ch. — of Gen. Stat. of Mo. —; *Security Fire Ins. Co.* v. *Ky. M. and F. Ins. Co.*, 7 Bush. (Ky.) 81; *Kennebec Co.* v. *Augusta Ins. and Bk. Co.*, 6 Gray (Mass.), 204; *Constant* v. *Ins. Co.*, 3 Wall. jr. 313; *Mar. Dock and Mut. Co.* v. *McMillan & Son*, 31 Alab. 711; *Baptist Church* v. *Brooklyn Fire Ins. Co.*, 18 Barb. 75; *Com. Mut. Mar. Ins. Co.* v. *Union Mut. Ins. Co.*, 19 How. 318, 321.

3. The point which has given us most difficulty is that made by defendant's counsel on the effect of the removal of the house from the position it first occupied. He claims that this removal changed the risk, or conclusively and necessarily increased it. If so, the underwriter is discharged; for it is plain that if another contract is put in the place of that he has made, or if, without changing the nature of the risk, it be increased in degree, there is an end to his liability. We do not cite authorities on a point so well settled and having so little authority for its support. But we do not see that the risk was necessarily either changed or increased by the removal of the building, bodily, from one spot to another. It has been decided that, if a house be thrown down, a policy against fire effected on the *house* will not protect the owner of the mass of rubbish which results from its fall, if that mass be consumed by fire. But that is a different case from the one we have before us; nor do we think there is any analogy between the case at bar and that of goods insured in one warehouse which are removed to, and destroyed by fire in, another. They are insured as being in a warehouse which perhaps remains untouched by fire, and are destroyed by a conflagation occuring in that to which they are removed. The description of the goods is changed, and so is the risk to which they have been exposed. Both these changes are manifest and unequivocal. In the case at bar, the property insured was as exactly within the

description contained in the policy after as before its removal, and the effect of the removal upon the risk, either to increase or change it, is, we think, a question of fact, not of law.

4. The counsel for respondent makes the point in his answer and in his argument that it was one of the conditions of the policy, declared in that instrument, that the house should not be removed from its place. We have examined the policy in vain in search of this condition. It is quite true that houses are ordinarily stationary, and until recently their removal from place to place was almost unknown. Of late years such removals, both here and elsewhere, have not been infrequent, and we are rather surprised that the effect of a fire occurring during such removal, or after it, on a policy against loss by fire, has not before this day occupied the attention of courts of justice. We think the instruction given by the Circuit Court was too broad, and reverse the judgment, remanding the case for further proceedings. All the judges concur.

GANTT, P. J., delivered the opinion of the court, on a motion for a rehearing.

The counsel for respondent have filed a motion for a rehearing, in which they claim that this court has mistaken both the facts and the law presented by this record. We have examined carefully the record, and the reasons for a rehearing, and, as briefly as we can, give our reasons for overruling the motion.

The first proposition stated and advocated is that there is no evidence tending to show that respondent agreed to accept Griswold as the insured party in the place of Cabanné. The counsel for respondent do not state this proposition precisely as we do, but if the difference of statement adopted by them be intentional, and they mean to concede the proposition as stated by us, they give up the case. We proceed to consider the proposition as we have stated it, and, as we think, to refute it.

The facts are that the policy was issued in May, 1870, for five years, in the sum of $4,000, in favor of Cabanné; that he paid the premium for the whole time ; that in August, 1870, having borrowed money from Fuchs and secured it by a mortgage on land, he caused a memorandum to be made by the secretary of respondent, on the face of the policy, and also on the policy register of respondent, that the loss, if any, should be paid to Fuchs; that in 1871 Cabanné sold to Griswold both the tract mortgaged to Fuchs and that on which the insured dwelling stood, and that, wishing to transfer to Griswold all the muniments of title, and papers held by him in connection with the property sold, he went to the respondent's office, on September 21st, apparently not remembering that Fuchs had the physical custody of the policy as well as the beneficial interest in it.   It was important to notify the company of the sale to Griswold, in order to prevent the insurance determining upon the sale.    If it had so determined, and a loss had occurred, the security of Fuchs would have been impaired *pro tanto*, and Griswold, the purchaser of the land subject to Fuchs' mortgage, would have been a loser.   If Griswold were a reputable person, there would, of course, be no probable difficulty in continuing the insurance.   But of this the company was the sole judge, and if it did not wish to continue the insurance to Griswold, who had taken Cabanné's place in respect of the land, it might refuse to do so, but would then become liable to refund to Cabanné more than two-thirds of the premium paid in 1870 for the whole term.   Such was the position of the parties.   Each must be supposed to have understood it.   It is true that Cabanné cannot remember what he said when he went to the company's office ; but it cannot be doubted that he visited it in the interests of Griswold.   These required the communication to respondent of the sale to Griswold, and the arrangement that, as he had succeeded to Cabanné's rights in respect of the land, he should succeed to Cabanné's

right in respect of this policy. Cabanné declares that he did everything required of him; but, as he is unable to speak with definiteness, if we had no further evidence we should be entirely in the dark on this point. But we look at the policy register of the respondent and see that, on September 21st (1871) this policy was by respondent's consent transferred to Griswold. The interpretation of this entry is the subject of inquiry. What did it mean?

Two interpretations are proposed by respondent. One was offered orally at the hearing. It was that this entry really meant nothing at all, as far as respondent was concerned; that it did not imply that Griswold was insured, as Cabanné had been, and that it was, indeed, no more than a mere unmeaning compliance by respondent with the ignorant wishes of Cabanné; that he desired the performance of a perfectly idle and harmless ceremony, and that respondent, with a smile at his simplicity, gratified his silly wish, well knowing that Griswold thereby obtained no insurance, although respondent, by this juggle, retained an unearned premium. In their motion, counsel for respondent speak with some bitterness of the scant justice which insurance companies ordinarily receive at the hands of juries. Unfortunately there is some room for such complaints; and there are thoughtless men who justify the prejudice which leads to this injustice by imputing to insurance companies a course of almost uniform disingenuousness in their dealings with their customers. We consider the imputation unfounded and the prejudice unjust; but we cannot imagine anything more calculated to show that we are wrong in both particulars than the interpretation here attempted of the entry made on the policy register of respondent on September 21, 1871. We reject that interpretation as totally inadmissible. It violates a fundamental rule of construction in that it declares that a writing capable, and naturally indicative, of a most important meaning has no significance at all. This is what is termed "*pessima interpretatio.*"

Another attempted interpretation is that the entry means that Griswold took the place, not of Cabanné, but of Fuchs, in respect of this policy. But this is impossible. Fuchs was in Europe. Cabanné could not have deprived Fuchs of the right to receive the sum insured, in case of a loss, except by forfeiting the policy altogether ; the very thing to prevent which he went to respondent's office at all. On the policy register, in juxtaposition with this entry of September 21, 1871, was the appropriation of the sum insured to Fuchs—not of part of it, but the whole. What could have possibly been the meaning of the statement that this policy was transferred to Griswold? Certainly not that he thereby was substituted for Fuchs ; *that* was palpably out of the question. Unless he took the place of the under-writer, he must of necessity take the place of Cabanné, and, of course, it is idle to talk of the possibility of his taking the place of the underwriter. On the other hand, what more natural than that the transfer, operated by the joint consent of Cabanné and the respondent, should be intended to put him in the place of Cabanné? If, indeed, it were a fact that he had no revertionary interest in the property insured, or that he had no reason for desiring the extin-guishment of Cabanné's debt to Fuchs, we would be forced to conclude that the parties were doing a very empty thing. But, knowing what the facts were, and seeing the motive and the explanation of all that was done, we cannot avoid the conclusion that the presumption of fact is very strong that respondent was fully apprised of the sale to Griswold, and, in consideration of the continuance of the policy and the avoidance of all question of the return of more than two-thirds of the premium paid by Cabanné, assented to the substitution of Griswold for him. This is our view of the *evidence* in the case. Coming to the supposed mistake as to the law applicable to the facts, we find that what is said by respondent's counsel on this head resolves itself into a denial that, in point of fact, the respondent accepted

Griswold as the vendee of Cabanné, and the transferee, with the consent of both Cabanné and respondent, of this policy. We will not go over again the demonstration we have made that this, and no other, is the interpretation of the entry made on respondent's policy register in September, 1871 ; and we confess ourselves at a loss to perceive for what, purpose the extract from the opinion of the court in 8 Gray, 28 (*Loring* v. *Manufacturers' Insurance Company*), is quoted by the counsel for respondent. But, as that case is really illustrative of the principles which we had in view in reaching the conclusion already announced in this cause, and as the extract made by respondent's counsel is somewhat obscured by being separated from its context, we here state the case with some fullness, and quote the entire passage in which. the sentence cited occurs.

In that case, by a policy dated June 11, 1853, the insurance company insured Beaumont in the sum of $4,000 on one-half of the Mitchell mill. On June 12, 1853, a. memorandum was made on the policy that, in case of loss, the money was to be paid to Loring, mortgagee. On July 8, 1853, Beaumont conveyed to Hinckley, subject to the mortgage to Loring. Of this conveyance no notice was given to the company, and no memorandum made on the policy or policy register. A loss having occurred, Loring sued, and, there being a condition in the policy that a conveyance of the property without the consent of the company should terminate the risk, he was defeated. It being announced at the trial that he must show that the company had been apprised of this sale to Hinckley and had assented to it, he attempted to make this appear by giving evidence that, on June 18, 1853, Beaumont had taken out another policy with defendant, for $2,400, on three-tenths of the Mitchell mill ; that, on the same day, a. memorandum was made on the face of this policy that $1,000 of the loss, if any, was to be paid to Sawyer ; and that, on July 8, 1853, having sold "*this property*" to

Hinckley, Beaumont transferred the policy to him, subject to the rights of Sawyer, with the assent of the company. Loring's counsel contended that this entry on the books of the defendant, and on the policy of June 18, 1853, by the officers of defendant, was evidence that the defendant had knowledge, not merely of the sale of the three-tenths of the Mitchell mill, but of the sale of the *whole interest of Beaumont* in the mill to Hinckley; and, consequently, as they argued, defendant had notice of the sale to him of the interest covered by the first policy, which was one-half of the mill. The court ruled otherwise. Judge Dewey said : " Whether, if it could be read as a notice of the sale of the whole, *such notice, without assent of the defendant to continue the policy as to the other portion previously insured, could avail, would present a serious and probably an insuperable difficulty; as it is the assent of the defendants to the continuance of the policy, after they are notified of the sale, that continues the policy for the benefit of the purchaser.* There is nothing anywhere to signify the assent of the defendants to continue *any other* policy than that of 18th June, which was upon a distinct three-tenths of the mill."

Now, we call attention to the fact that, in the case at bar, Cabanné, after effecting insurance on his house, ordered the loss, if any, to be paid to Fuchs' mortgagee, and then sold the property subject to the mortgage. In the case reported in 8 Gray, Beaumont, after effecting insurance on his mill, ordered the loss, if any, to be paid to Loring's mortgagee, and then sold the property subject to the mortgage. But Beaumont failed to report this sale to, or to cause the policy to be transferred to his vendee by, the company. Cabanné carefully did this, and this is the distinction between the two cases. What was the effect of this act which Cabanné performed, and Beaumont omitted, in the opinion of the Supreme Court of Massachusetts? It was, in the language of Judge Dewey, already quoted, "to continue the policy for the benefit of the purchaser." But how for *his*

benefit, seeing that, in case of loss, another person was designated as the payee of it? Obviously because in such case the insurance company would pay a debt which would otherwise be a charge on the land denuded of the building. This is all that appellant needs here. We suppose that it will not be seriously denied that the respondent intended the natural consequences of its act when making the entry which has been considered. - We have seen what is the necessary interpretation, the irresistible meaning of that entry or that act. When it declared that the policy was transferred to Griswold, this declaration, made at Cabanné's instance, could only mean that Griswold was substituted in the policy for Cabanné. It could not mean that he was substituted for Fuchs, for no one but Fuchs was competent to make such substitution, and the only possible remaining meaning was : Griswold, having succeeded to Cabanné's relations to the land, was substituted for him in the policy. The motion for a rehearing is overruled, all the judges concurring.